UNITED STATED DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RHODE ISLAND RESOURCE RECOVERY CORPORATION *Plaintiff* | : | |
| v. | : | C.A. No.05-451-ML |
| THE RHODE ISLAND DEPARTMENT OF ENVIRONMENTAL MANAGEMENT, by and through its Director, W. MICHAEL SULLIVAN *Defendant* | : | |

RHODE ISLAND DEPARTMENT OF ENVIRONMENTAL MANAGEMENT'S

MOTION TO DISMISS

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Rhode Island Department of Environmental Management hereby moves for an order this action. In support of the relief sought in this motion, the Rhode Island Department of Environmental Management relies upon the Memorandum in Support of Rhode Island Department of Environmental Management's Motion to Dismiss, filed contemporaneously herewith, and all other materials and arguments to be properly submitted in support of the relief requested herein.

WHEREFORE, the Rhode Island Department of Environmental Management respectfully requests that this motion be granted and an order enter dismissing this action.

Respectfully submitted
Rhode Island Department of
Environmental Management
By its attorney

John A. Langlois, Esq. RI Bar No. 3488
Deputy Chief Legal Counsel
DEM – Office of Legal Services
235 Promenade Street
Providence, RI 02908
(401) 222-6607
(401) 222-3378 (Fax)

Respectfully submitted
State of Rhode Island
By its attorney
Patrick C. Lynch
Attorney General

Michael Rubin, RI Bar No. 3656
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Extension 2116
(401) 222-3016 (Fax)

## CERTIFICATION

I, the undersigned, hereby certify that a copy of the foregoing was sent regular mail, postage pre-paid to those listed below, on this 5th day of May, 2006.

Patricia K. Rocha, Esq.
R. Bart Totten, Esq.
Kristen W. Sherman, Esq.
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

Richard A. Sherman, Esq.
Raymond M. Ripple, Esq.
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903

UNITED STATED DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RHODE ISLAND RESOURCE RECOVERY CORPORATION *Plaintiff* | : | |
| v. | : | C.A. No.05-451-ML |
| THE RHODE ISLAND DEPARTMENT OF ENVIRONMENTAL MANAGEMENT, by and through its Director, W. MICHAEL SULLIVAN *Defendant* | : | |

# RHODE ISLAND DEPARTMENT OF ENVIRONMENTAL MANAGEMENT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## Introduction

In the matter before the Court, Plaintiff Rhode Island Resource Recovery Corporation (hereinafter referred to as, "RIRRC") is seeking a declaration that the Rhode Island Department of Environmental Management (the "Department" or "DEM") does not have jurisdiction to enforce Rhode Island State statutes and regulations at the Central Landfill Superfund Site. The Department responds that the declaration sought by RIRRC is directly contrary to the express terms and objectives of the Consent Decree entered in United States of America v. Rhode Island Solid Waste Management Corporation, C.A. No. 96-408P. In addition, the declaration sought by RIRRC is not in the best interests of the public health, welfare or the environment as well as the doctrines of sovereign immunity and abstention.

The declaration sought by RIRRC to restrict the Department's inspection powers is inconsistent with the express language of the Consent Decree signed by RIRRC. The Consent

Decree specifically recognizes the Department's authority to inspect the Superfund site. The Consent Decree also requires RIRRC to comply with specific Rhode Island environmental laws and regulations. Indeed, these environmental regulations are specifically identified in the Consent Decree by a term of their own: "all applicable or relevant and appropriate federal and state requirements" ("ARARs"). These ARARs are specified in the Record of Decision ("ROD") and Statement of Work (SOW") that are incorporated into the Consent Decree. Therefore, the Consent Decree authorizes the DEM to inspect the RIRRC Superfund Site for compliance with Rhode Island statutes and regulations. Beyond that, a separate clause in the Consent Decree more generally recognizes the applicability of state law.

The Consent Decree does not restrict the Department's authority to enforce the statutes and regulations of the State of Rhode Island. Indeed, the Consent Decree expressly states that the settlement does not affect the rights of anyone not a signatory. The Department did not sign the Consent Decree and the Department was not a party to the settlement. Therefore, the Consent Decree does not affect the Department's rights, including the Department's rights to enforce the statutes and regulations of the State of Rhode Island.

Moreover, with regard to the State's authority at this Superfund site, two great principles are at stake: *First,* under the *Ex Parte* Young line of cases, especially the Coeur d'Alene case, a federal court may not entertain a suit which would remove an enclave of territory from a state's police power; *second*, under the Younger line of cases, especially the Nick v. Abrams case, nor may such a court disrupt a state criminal prosecution and related activities once a search warrant has been issued. This suit essentially seeks to have this Court commit both of these errors and must, therefore, be dismissed in full.

As shall be shown herein, the Consent Decree is dispositive of all of the issues raised in the Plaintiff's Complaint and the Complaint fails to state a claim upon which relief can be granted. Consequently, this matter should be summarily dismissed.

## Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of actions for failure to state a claim upon which relief can be granted. In ruling on a motion filed under Rule 12(b)(6), the court must "accept the well pleaded factual averments of the . . . complaint as true, and construe these facts in the light most favorable to the [plaintiff]." Chongris v. Board of Appeals, 811 F.2d 36, 37 (1st Cir. 1987). A Rule 12(b)(6) motion will only be granted when, viewed in this manner, it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L. Ed. 2d 80 (1957).

Under a Rule 12(b)(6) motion, "a reviewing court is obliged neither to credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation, nor to honor subjective characterizations, optimistic predictions, or problematic suppositions." United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992). Unverifiable conclusions, not supported by the stated facts, deserve no deference. *Id.*

## Facts and Proceedings

On May 16, 1996, the Plaintiff and the United States executed a Consent Decree, to which the State of Rhode Island was *not* a party, requiring the Plaintiff to clean up hazardous substances present on a portion of the Central Landfill (a major garbage disposal facility) owned and operated by the Plaintiff in Johnston, Rhode Island.

On or about August 16, 2005, the State issued a Notice of Intent to Enforce to the Plaintiff prohibiting the use of ash at the site without prior Department approval. Thereafter, on October 12, 2005, the State obtained a search warrant from the Rhode Island District Court authorizing entrance onto the site to obtain samples of ash and soils. The State did so.

Apparently operating under the assumption that the State is concerned solely with the source and content of the ash, the Plaintiff argues that its use of ash is legal, both on federal pre-emption grounds and on grounds of a letter (the O'Neil letter) by the Rhode Island Attorney General, dated 1989. But, rather than test these theories of defense in state court (assuming that the State desires to proceed on the basis of the ash), Plaintiff instead brings this suit in Federal Court. By this suit, Plaintiff seeks an injunction and a declaration prohibiting the State from: (1) requiring Plaintiff to obtain a state permit with respect to the site; (2) entering onto the site; and (3) commencing or engaging in any civil, administrative or criminal proceeding with respect to the site.

Argument

I. The plain language of the Consent Decree is dispositive of all issues raised in Plaintiff's Complaint.

A. State's enforcement rights not negated by Consent Decree

RIRRC agreed in the Consent Decree that, "Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a party to this Consent Decree. **The preceding sentence shall not be construed to waive or nullify any rights that any person not a signatory to this decree may have under applicable law.**" Consent Decree, Section 98 (emphasis added). RIRRC now asserts, however, that the Consent Decree gives the EPA sole jurisdiction at Phase I of the Central Landfill. This position is directly contrary to the express language of Section 98 of the Consent Decree.

The DEM was not a signatory to the Consent Decree. The DEM was not a party to the Consent Decree. Therefore, the Consent Decree does not waive or nullify any rights of the DEM under applicable law. Pursuant to Section 98, the Consent Decree has no effect on the environmental enforcement rights of the Department.

There can be no dispute that the RIRRC's operation of the Central Landfill is subject to the statutes and regulations of the State of Rhode Island. "[A}ny solid waste facilities under the jurisdiction of the corporation (RIRRC) shall be subject to the regulatory and enforcement activities of the department of environmental management." R.I. Gen. Laws § 23-19-12 (2001 reenactment). RIRRC acknowledged in the ROD that, "The Superfund Site is defined as th1e 154 acres located in the central portion of RISWMC (now, RIRRC) property which has been licensed for landfilling by the State of Rhode Island." Record of Decision, Section I, Page 1. As

a DEM licensed landfill, the area of the Central Landfill on which the Superfund remedy is being implemented is indisputably subject to the regulatory and enforcement activities of the department of environmental management.

Because the Consent Decree does not waive or nullify any rights of the DEM under applicable law, the Consent Decree has no effect on the environmental enforcement rights of the Department. Merely because RIRRC entered into an agreement with EPA to settle the Superfund case does not mean that the DEM gave up any of its enforcement rights. The RIRRC's contention that DEM has abrogated its enforcement authority to the EPA is outrageous. The DEM will continue to vigorously comply with its statutory mandate to protect the natural resources of the State of Rhode Island. R.I. Gen. Laws § 42-17.1-2(a) (1993 reenactment)

B. Consent Decree requires RIRRC to comply with all state laws in addition to ARARs

The Consent Decree requires that the Superfund remedial work "be performed in accordance with the requirements of all applicable federal and state laws and regulations." Consent Decree, Section 7. This language is deliberately expansive and encompasses all Rhode Island and Federal laws. Without question, this language was incorporated into the Consent Decree because the RIRRC and EPA both understood that the Consent Decree did not constitute not a waiver of any laws. The plain language is clear: by executing the Consent Decree, RIRRC was merely settling the EPA's enforcement action, not escaping any other statutory or regulatory obligations.

Section 7 goes on to state that RIRRC "must also comply with all applicable or relevant and appropriate requirements of all Federal and state environmental laws as set forth in the ROD

and the SOW." *Id.* This second sentence specifically refers to the ARARs. The ARARs identify the State and Federal environmental laws governing the Superfund remediation. These ARARs are painstakingly defined in the ROD. Specifically, Tables 7 through 14 in Appendix B of the ROD cite each and every Federal and State environmental statute and regulation with which RIRRC must comply in performing the remedy. Consent Decree, Appendix A, "Record of Decision", Appendix B, "List of Tables", Tables 7-14. The ARARs are limited to those environmental statutes and regulations delineated in the ROD and SOW.

The Plaintiff would like this Court to believe that the ARARs are the *only* applicable State laws enforceable under the Consent Decree. Accordingly, RIRRC is requesting that this Court narrow all enforcement authority at Phase I of the Central Landfill to only the ARARs. Such a myopic view is inconsistent with the plain and unambiguous language of the Consent Decree.

The distinction between these two sentences in Section 7 is subtle, but very important. The first sentence in Section 7 of the Consent Decree applies to all applicable Rhode Island laws and regulations. The second sentence only refers to "environmental laws" listed as ARARs. These ARARs are not the sole source of enforcement authority, however. The first sentence of Section 7 clearly states that remedial activities at the Superfund Site are governed by **all** applicable State and Federal laws, not merely the environmental laws. If RIRRC's limited interpretation of the Consent Decree were correct, then a murder could be committed at the Superfund Site and the State of Rhode Island would have no jurisdiction to prosecute the murderer unless the ARARs included the Rhode Island homicide statute. Certainly, RIRRC's position is absurd.

The Court should note that the second sentence of Section 7 used the word "also" in describing the obligations of RIRRC. One can only assume from the use of the word "also" that the parties to the Consent Decree intended for RIRRC to incur not only the obligations in the

first sentence, but the additional obligations found in the second sentence. If RIRRC were correct that only the ARARs apply, then the first sentence in Section 7 would be unnecessary and the word "also" would not appear in the second sentence of Section 7.

The first sentence of Section 7 requires RIRRC to comply with all applicable Rhode Island laws and regulations. *Id.* "All applicable laws" include Rhode Island General Laws § 23-19-13.1. That criminal statute prohibits the disposal at Central Landfill of any solid waste generated outside of Rhode Island. Such disposal is a felony. The State of Rhode Island has the right and obligation to investigate and prosecute the violation of the "out-of-state waste" statute.

The ROD does not specifically include Rhode Island General Laws § 23-19-13.1 as an ARAR. Therefore, the RIRRC would prefer that this Court ignore the clear language of Section 7 and not apply the "out-of-state waste" statute to the remedial action at this Superfund Site. The Consent Decree, however, is clear. All applicable State laws shall govern the remedial work, not merely the ARARs. Therefore, RIRRC was required by the Consent Decree to comply with all Rhode Island State law, including Rhode Island General Laws § 23-19-13.1.

### C. Section 8 of the Consent Decree Misconstrued by RIRRC

In Paragraph 9 of the Plaintiff's Complaint, RIRRC correctly quotes from Section 8(a) of the Consent Decree that no permit shall be required for any remedial work done on-site. RIRRC's Complaint also correctly quotes section 121(e)(10 of CERCLA and 40 C.F.R § 300.400(e)(1). These sections of the Consent Decree, Federal statute and Federal Regulation all set forth that no permit shall be required for any of the on-site remedial activity. The Department does not dispute that language.

What RIRRC fails to note, however, is that Section 8(a) of the Consent Decree, section 121(e)(1) of CERCLA, and 40 C.F.R § 300.400(e)(1) do not exempt RIRRC from obtaining all necessary approvals from the State of Rhode Island. These sections clearly distinguish between "permits" and "approvals". The words "permit" and "approval" are not used synonymously in the Consent Decree. Section 8 specifically refers to both "permits" and "approvals" in the second sentence. Section 8(a) of the Consent Decree, section 121(e)(1) of CERCLA, and 40 C.F.R § 300.400(e)(1) only exempt RIRRC from obtaining all necessary permits. These sections do not exempt RIRRC from obtaining all necessary approvals. RIRRC's pleadings fail to note this distinction.

Plaintiff Complaint leaps from the "permit" language in the Consent Decree to a declaration that the DEM has no "right, power, or authority to compel Plaintiff to obtain from it any permit, **license, or approval** in order to implement or perform any aspect of on-site remediation within the Superfund Site." Plaintiff's Complaint, Page 9 (emphasis added). All of the paragraphs in Plaintiff's Complaint preceding the prayer for relief refer only State "permit" requirements. In an exercise of sleight-of-hand, RIRRC never refers to "permit, license, or approval" until it seeks a declaratory judgment that includes licenses and approvals.

Further, the Department has never required RIRRC to obtain a permit for any of the on-site remediation at the Superfund Site. RIRRC incorrectly implies in the Complaint that a Notice of Intent to Enforce issued by the Department on August 16, 2005 required RIRRC to obtain a permit. The Plaintiff did not attach a copy of the August 16 letter. For the Court's edification on this point, the Department now attaches hereto a copy of the August 16, 2005 Notice of Intent to Enforce as Exhibit A.

In a craftily worded Paragraph 22 of the Complaint, RIRRC alleges that DEM notified the Plaintiff that RIRRC did not have a permit or approval from the Department for the use of out-of-state ash as controlled fill. Paragraph 22 is vague as to how DEM notified RIRRC of the permit requirement. However, Paragraph 19 of the Complaint refers to the August 16 Notice of Intent to Enforce and the Department's assertions as to the use of ash as controlled fill. Together, these paragraphs are meant to suggest that DEM's August 16 Notice of Intent to Enforce ordered RIRRC to obtain a permit. That is not accurate.

The DEM never required any permit for the ash used by RIRRC as controlled fill. The August 16, 2005 Notice of Intent to Enforce merely required RIRRC to obtain an approval from the Department, not a permit. Paragraph D(4) of the Notice of Intent to Enforce states, "RIRRC shall only be permitted to use material(s) as controlled fill after RIRRC obtains a written approval from RIDEM." August 16, 2005 Notice of Intent to Enforce, Page 3.

Because DEM never required RIRRC to obtain a permit for the ash, the Department's August 16, 2005 Notice of Intent to Enforce is not inconsistent with the Consent Decree. RIRRC seeks to enjoin DEM from requiring a permit that DEM is not requiring. Therefore, no declaratory judgment or injunctive relief on this issue is warranted.

D. DEM authorized by Consent Decree to inspect Superfund Site

RIRRC asserts that DEM does not have any regulatory authority concerning the remediation activities at the Superfund Site. Therefore, RIRRC concludes, DEM should be enjoined from entering onto the Superfund Site. This position is contrary to the express language of the Consent Decree.

Section 26 of the Consent Decree specifically grants the State of Rhode Island "access at all reasonable times to the Site . . . for the purposes of conducting any activity related to this Consent Decree including, but not limited to: monitoring . . . verifying any data . . . conducting investigations . . . obtaining samples . . . implementing response actions . . . inspecting and copying records . . . and assessing Settling Defendant's compliance with this Consent Decree." Consent Decree, Section 26. The Consent Decree does not require the DEM to obtain the "consent, order or approval of EPA" before gaining access pursuant to Section 26. Section 26 specifically empowers the State of Rhode Island to gain access to do the activities listed. Therefore, the injunctive relief sought by RIRRC prohibiting the Department's access is contrary to the express language of the Consent Order.

E. Department not estopped by remedy concurrence

RIRRC attached a copy of the June 15, 1994 concurrence letter to its Complaint as Exhibit B. In this concurrence letter, the DEM Director expressed his agreement with the proposed conceptual remedy for the Superfund Site. Director Annarummo did not waive all State enforcement authority. He merely expressed agreement with the concept of capping the Superfund Site at Central Landfill. He also stated without equivocation that, "the remedy, as proposed and implemented, must ensure compliance with all applicable or relevant and appropriate State and federal statutes, regulations and policies." Consent Decree, Appendix A, "Record of Decision"; Appendix C, "State of Rhode Island Concurrence Letter".

RIRRC now asserts that because the Department consented to the proposed remedy, the DEM is now estopped from exercising its enforcement authority at Phase I of the Central

Landfill. This position ignores the plain language of the concurrence letter. As set forth elsewhere herein, the Department is obligated by statute to enforce the environmental laws of the State of Rhode Island. The Department did not abrogate that obligation merely by concurring to the conceptual remedy. Therefore, the Department should not be estopped from enforcing the laws of the State of Rhode Island.

## II. The Couer D'alene Doctrine Bars This Attempt To Carve-Out A Substantial Portion Of Land As An Area That Would Be Free Of State Sovereignty.

### A. UNDER COUER D'ALENE, SOVEREIGN IMMUNITY APPLIES TO THIS CASE EVEN IF THE PLEADING REQUIREMENTS OF *EX PARTE* YOUNG ARE MET.

#### 1 Suits Against State Policies Must Be Framed So As To Avoid The Bar Of Sovereign Immunity.

As the high Court has noted, the Eleventh Amendment stands "not so much for what it says, but for the presupposition . . . which it confirms." Blatchford v. Native Village of Noatak, 501 U.S. 775, 779 (1991). That "presupposition" is the doctrine of sovereign immunity, *i.e.*, that "'it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.'" Hans v. Louisiana, 134 U.S. 1, 13 (1890) (quoting THE FEDERALIST NO. 81 (A. Hamilton)).

Under the Eleventh Amendment, it does not matter what form of relief a citizen might request in a suit directed against a state agency; all suits against state agencies themselves are to be dismissed. See Cory v. White, 457 U.S. 85, 90 (1982). Accord ANR Pipeline Co. v. Iowa State Commerce Com'n, 828 F.2d 465, 470 (8th Cir. 1987) ("even a suit solely for prospective injunctive relief when it is brought against a state agency *qua* state agency is barred by the amendment"); Midwestern Gas Transm'n v. McCarty, 120 F.Supp.2d 1155 (S.D. Ind. 2000)

("[n]o exception applies to Midwestern's suit directly against the Indiana Utility Regulatory Commission itself").

2. Under *Ex Parte* Young, It Is Usually Possible To Avoid Sovereign Immunity By Making Allegations Against A State Official.

There is, of course, one major qualification (often referred to as an "exception") to the doctrine of sovereign immunity as it is enshrined in the Eleventh Amendment. A route exists for a party to effectively obtain relief against a state agency in federal court; this is the *Ex Parte* Young so-called "exception." (the rule is not precisely an "exception" as the citizen's suit is not against a state, but a state official.) In such a suit, where a party seeks prospective equitable relief only from a state *official*, the Eleventh Amendment generally does not block the exercise of the judicial power of the United States. See *Ex Parte* Young, 209 U.S. 123, 158-59 (1908).

If the Plaintiff were to make express allegations against DEM's director in his official capacity[1] this, at first blush, might ordinarily satisfy the pleading requirements. But, enter the Coeur d'Alene opinion.

3. Under Coeur d'Alene, However, Some Suits Against State Policies Are Of A Type That Can*not* Be Framed So As Avoid The Bar Of Sovereign Immunity.

The decision in Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 271 (1997), recognized that, because of the threat to federalism and state sovereignty implicated by the *Ex Parte* Young doctrine, the rule needed limitations. The upshot (of Coeur d'Alene) is a major exception to the "exception" (represented by *Ex Parte* Young).

The narrowing of the *Ex Parte* Young doctrine in Coeur d'Alene arose in a federal suit by an Indian tribe seeking a declaratory judgment establishing its right to quiet enjoyment over the submerged lands of Lake Coeur d'Alene and, in addition, seeking prospective injunctive relief

against numerous Idaho state officials to prevent them from exercising the state's asserted jurisdiction over those submerged lands. Coeur d'Alene, 521 U.S. at 265. The Court was badly fractured by the case,[2] but a majority of Justices agreed that *Ex Parte* Young could not save the tribe's federal suit even though it was properly pled under the long-recognized requirements of that doctrine. See Coeur d'Alene, 521 U.S. at 292 (Kennedy, J., majority opinion). These Justices agreed that, instead, the tribe's requested injunctive relief would be tantamount to the removal of an entire territorial area from the state's police power. After cataloging the sovereign interest in submerged lands and after indicating that the action constituted the "functional equivalent" of a quiet-title action (see id. at 281 (Kennedy, J., majority opinion); id. at 289 (O'Connor, J., concurring)), the Court arrived at its main thrust. The Court's central focus was neither the public trust doctrine nor the fact that the action, if successful, would effectively divest legal title. Although these factors figured prominently, the concern went deeper:

> **The suit seeks, in effect, a determination that the lands in question are not even within the regulatory jurisdiction of the State. The requested injunctive relief would bar the State's principal officers from exercising their governmental powers and authority over the disputed lands and waters. The suit would diminish, even extinguish, the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory.** To pass this off as a judgment causing little or no offense to Idaho's sovereign authority and its standing in the Union would be to ignore the realities . . ..

[1] In reality, the Plaintiff has not even met this pleading hurdle as is detailed *infra*.

[2] Justice Kennedy wrote the principal opinion for the Court, but the more general provisions of his opinion garnered only one other vote. See Coeur d'Alene, 521 U.S. 261, 262-63 (Kennedy, J., minority opinion, with Rehnquist, C.J., as to Parts II-B, II-C, and II-D). The controlling concurrence by Justice O'Connor rejected Justice Kennedy's view that the *Ex Parte* Young doctrine should be generally limited but endorsed his defense of state territorial integrity. See id. at 288 (O'Connor, J., concurring in judgment, with Scalia, J., and Thomas, J.) The dissent by Justice Souter, see id. at 297 (Souter, J., dissenting, with Stevens, J., Ginsburg, J., and Breyer, J.), rejected both Justice Kennedy's minority view and the position of common ground for the Court's majority, *i.e.*, that the *Ex Parte* Young doctrine may not be used to divest the state of its sovereign police power over land within its boundaries.

Id. at 282 (emphasis added). This was heavily underscored in those portions of Justice O'Connor's controlling concurrence wherein she agreed with the principal opinion:

> **[T]he Tribe seeks to eliminate altogether the State's regulatory power over the submerged lands at issue — to establish not only that the State has no right to possess the property, but also that the property is not within Idaho's sovereign jurisdiction at all.**

Coeur d'Alene, 521 U.S. at 289 (emphasis added) (O'Connor, J., concurring).

> When state officials are found to have no right to possess a disputed parcel of land, the State nevertheless retains its authority to regulate uses of the land. Here, **the Tribe seeks a declaration** not only that the State does not own the bed of Lake Coeur d'Alene, but also **that the lands are not within the State's sovereign jurisdiction.**

Coeur d'Alene, 521 U.S. at 290-291 (emphasis added) (O'Conner, J., concurring). The critical fact was that the particular outcome prayed-for would have effectively blocked state officials from exercising jurisdiction over a substantial portion of land within the state's territory. That kind of relief "implicates special sovereignty interests." Id. at 281 (Kennedy, J., majority opinion).

In the final analysis, a court should not extend the *Ex Parte* Young "exception" to allow a suit when the relief would be just as intrusive into core aspects of a state's territorial sovereignty as a suit against such state itself. Here, the Plaintiff's attempts to accomplish the removal of its land (land particularly invested with public interest concerns) from the authority of the State courts, State licensing agencies, and State officials armed with warrants. This clashes with the protection afforded by Coeur d'Alene.

B. THE CLAIM IS NOT PROPERLY PLED IN ORDER TO QUALIFY FOR THE *EX PARTE* YOUNG EXCEPTION TO SOVEREIGN IMMUNITY.

Plaintiff has not framed its Complaint to meet the minimal pleading requirements of *Ex parte* Young.

1. Under *Ex Parte* Young, A Plaintiff Must Make Allegations Against A State Official In The Body Of Its Complaint In Order to Avoid Sovereign Immunity.

As shown earlier, the gravamen of the *Ex Parte* Young legal fiction is the making of substantive allegations against an *official* and alleging that the conduct was specifically carried out in an *official capacity*. This flows directly from the pronouncements of the Supreme Court:

> Thus, implementation of state policy or custom may be reached in federal court only because **official-capacity** actions . . . are not treated as actions against the State. *See* ***Ex parte*** **Young** . . . .

Kentucky v. Graham, 473 U.S. 159, 167 (1985) (emphasis added). Accord Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989).

In short, unanimous precedent demands that the Plaintiff adopt a pleading formulation that makes substantive allegations against a State official *and* alleges that such actions were undertaken in an official capacity. The inquiry becomes whether the Plaintiff has sued Director Sullivan for actions in his official capacity.

2. Plaintiff Makes No Allegations Against Any State Official And Makes No "Official Capacity" Allegation, Thus Disqualifying Plaintiff From Taking Advantage Of *Ex Parte* Young.

The Plaintiff itself essentially pleads, in paragraph 4 of its Complaint, that the defendant Rhode Island Department of Environmental Management is a state agency created by an act of the Rhode Island General Assembly. It is self-evident that the Rhode Island Department of Environmental Management has no legal existence separate and apart from the State of Rhode

Island. The naming of the Department of Environmental Management (and the making of allegations against it alone) must be treated as the naming of the State itself.

Surprisingly, there is *no* allegation in the *body* of the Complaint pertaining to Director Sullivan. After the *caption*, Director Sullivan is forgotten. Director Sullivan is only mentioned in the *caption* and then disappears from Plaintiff's pleading. Given this resounding silence, the Plaintiff's claims constitute a bare suit against the State and (even putting aside Couer d'Alene considerations) the suit must be disposed of under traditional Eleventh Amendment case law. The *Ex parte* Young exception to the ban on private suits against states in federal court is not met.[3]

In its recent reply memorandum on the subject of a preliminary injunction, Plaintiff reveals two misunderstandings of this argument. First, Plaintiff fails to recognize that the key defect is in the *body* of the complaint, rather than the *caption*. The *body* is wholly lacking in allegations against the named official — he is not even mentioned. Second, Plaintiff cites a case brought against a *city*, failing to grasp that the Eleventh Amendment applies only to the *State* itself.

---

[3] The situation is not saved by the addition of "by and through" language in the caption. The fact remains that, regardless of the *caption*, the *body* of the complaint is deficient in that it does not even mention Director Sullivan let alone make any allegation that his actions took place in an official capacity.

Aside from this defect, even the caption is not well-formulated to meet the requirements of the *Ex parte* Young exception to sovereign immunity. The "by and through" phrasing is not the phrasing insisted upon by the courts. As related in the text, the entire *raison d'être* of *Ex parte* Young is a suit against state officials in their *official* capacities. As simply re-stated in one case :

> To pursue its claim for relief, Midwestern relies primarily on the doctrine of *Ex parte* Young to obtain injunctive and declaratory relief against the five Commissioners in their **official capacities**. Under *Ex parte* Young, an individual state officer may be sued in his or her **official capacity** to enjoin a prospective action under state law that would violate the Constitution. . . . The doctrine is a species of legal fiction, but it is a venerable legal fiction that plays a central role in the relationship between federal law and state governments.

Midwestern Gas Transmission Co. v. McCarty, 120 F.Supp.2d 1155, 1163 (S.D. Ind. 2000).

## III. YOUNGER AND RELATED DOCTRINES BAR THIS ATTEMPT TO HALT A SUBSTANTIALLY ONGOING CRIMINAL PROSECUTION.

### A. YOUNGER v. HARRIS REQUIRES THIS COURT TO DISMISS SINCE, FOR THE PURPOSES OF THAT CASE, A STATE CRIMINAL PROCEEDING IS PENDING BY VIRTUE OF THE ISSUANCE OF A SEARCH WARRANT.

#### 1. Younger Bars Federal Injunctions Against Pending State Criminal Proceedings.

In Younger v Harris, 401 U.S. 37 (1971), the Court held that prospective federal relief is generally barred in cases involving pending state criminal prosecutions. The Court proceeded to explain that there is ordinarily no irreparable injury if the threat to plaintiff's federally protected rights can be eliminated by the defense of a single criminal prosecution, and "even irreparable injury is insufficient unless it is 'both great and immediate.'" Id. at 45. The Court said that the possibility of a "chilling effect" does not, in and of itself, justify federal intervention. Id. at 50. A federal injunction or declaration can run against a pending state criminal prosecution only under rare circumstances. Id. at 54.

#### 2. A State Criminal Prosecution Is Deemed Pending Where A Search Warrant Has Been Issued.

Notwithstanding the broad sweep of its reasoning, discussed below, the bare narrow holding of the Younger case, taken literally, applies only when the state proceeding is already pending. This specific requirement *is* met here. Indeed, it has been directly held that a "pending state proceeding" has begun when a state prosecutor executes a search warrant authorized by a judge during a criminal investigation prior to arrest or indictment. Nick v. Abrams, 717 F.Supp. 1053, 1056 (S.D.N.Y. 1989). The holding of the Nick case was heavily relied upon in Kingston v. Utah County, 161 F.3d 17 (10th Cir. 1998).

In Kaylor v. Fields, 661 F.2d 1177 (1981), the Eighth Circuit held that a federal court, sitting in equity, should decline to hear a constitutional challenge once subpoenas have been

issued pursuant to a prosecutor's subpoena power. Similarly, courts have abstained from hearing actions once there have been grand jury subpoenas. See, e.g., Craig v. Barney, 678 F.2d 1200 (4th Cir.), cert. denied, 459 U.S. 860 (1982); Texas Ass'n of Business v. Earle, 388 F.3d 515 (5th Cir. 2004); Law Firm of Daniel P. Foster, P.C. v. Dearie, 613 F.Supp. 278, 280 (E.D.N.Y. 1985); Notey v. Hynes, 418 F.Supp. 1320, 1326 (E.D.N.Y. 1976).

Finally, common sense dictates that a criminal investigation is an integral part of a criminal proceeding. Without subpoenas, grand jury investigations and searches pursuant to search warrants, prosecutors seldom could amass the evidence necessary to commence criminal actions. Permitting the targets of state criminal investigations to seek injunctions in federal court after subpoenas or search warrants (albeit prior to their indictment or arrest) would do as much damage (and, perhaps, even more damage considering that the states would be deprived of the power to even discover crimes) to the principles of equity, comity, and federalism as allowing federal courts to enjoin ongoing state criminal trials; this logic gains force when one considers that such trials are merely the fruits of such subpoenas or search warrants. Cf. Barr v. Abrams, 641 F.Supp. 547, 554 (S.D.N.Y. 1986) ("Federal courts cannot permit the civil rights action to be used as a combative defense against a state criminal prosecutor's conduct of an investigation"), aff'd, 810 F.2d 358 (1987).

3. Ancillary Proceedings, Such As The Issuance And Execution Of A Search Warrant, Are Deemed To Be Part Of The Main Proceeding For Younger Purposes.

Another way of stating the above proposition is that the warrant process, although ancillary, is, for the purposes of the Younger analysis, deemed to be an integral part of the prosecution itself. Even if the search warrant itself (the results of which Plaintiff now seek to enjoin) can be viewed as a separate, ancillary, judicial activity by the state court system, Younger still applies. The Supreme Court has *not* restricted Younger to situations where the

plaintiff seeks to enjoin the main proceeding (as contrasted with ancillary, collateral or supplemental proceedings). Thus, even if the central criminal proceeding itself has not yet, technically, commenced, this situation is still within Younger's reach.

In Trainor v. Hernandez, 431 U.S. 434 (1977), the state had sued certain individuals in order to recover welfare payments. In conjunction with that state action, writs of attachment were issued. The individuals then filed an action in federal court seeking an injunction against the writs. Arguing before the Supreme Court, the individuals made the following assertion: only the attachment proceeding was being interfered with — the underlying fraud action could continue unimpeded. Id. at 446. But the Supreme Court held that Younger was triggered by state judicial activity other than an entire substantive proceeding.

Likewise, in Juidice v. Vail, 430 U.S. 327 (1977), certain parties had disobeyed subpoenas to appear in supplemental proceedings brought by judgment creditors attempting to collect. Turning to federal court, these parties then sought to enjoin the use of those procedures (which were in the nature of contempt hearings). In finding that the lower court should have abstained, the Supreme Court held that the salient factor was not the label given the contempt proceedings, but the federal court's undue interference with any facet of a state court's activities. Id. at 335-36.

See also Pennzoil Co. v. Texaco Inc., 481 U.S. 1, 15 (1987) (federal court may not enjoin state *supersedeas* bond provision designed to protect the functioning of the state judicial system); Perez v. Ledesma, 401 U.S. 82, 84-85 (1971) (Younger applies to evidentiary suppression proceeding); Gentner v. Shulman, 55 F.3d 87, 89 (2nd Cir. 1995) (state court's disqualification of defense attorney was outside the federal court's jurisdiction even though the federal court was not asked to stop the underlying prosecution itself); Morano v. Dillon, 746

F.2d 942, 945 (2nd Cir. 1984) (district attorney's choice between preliminary hearings or grand jury for felony complaints deemed protected by Younger); Wallace v. Kern, 520 F.2d 400, 405 (2nd Cir. 1975) (abstention required because state has "a most profound interest" in bail application proceedings), cert. denied, 424 U.S. 912 (1976); Parker v. Turner, 626 F.2d 1, 4 (6th Cir. 1980) (civil contempt proceedings in child support cases deemed protected by Younger); Mounkes v. Conklin, 922 F.Supp. 1501, 1512 (D. Kan. 1996) ("State's interest is not any less simply because a defect in setting the bail bond is not a defense to the actual criminal prosecution"); Epps v. Levine, 457 F.Supp. 561, 568 (D. Md. 1978) (abstention required because bail proceedings "assure a criminal defendant's appearance at trial"); Mudd v. Busse, 437 F.Supp. 505, 511 (D.C. Ind. 1977) ("bail setting process is an integral part of the criminal justice system").

4. Younger Applies To State Civil And Administrative Actions Brought By Public Authorities.

The Court's concern for comity and federalism has led it to hold that the Younger policies are "fully applicable to noncriminal judicial proceedings when important state interests are involved." Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982). See also Huffman v. Pursue, Ltd., 420 U.S. 592, 604-05 (1975); Trainor v. Hernandez, *supra*, 431 U.S. 434, 444 (1977). In Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc., 477 U.S. 619 (1986), the Supreme Court held that the Younger doctrine calls for abstention from ongoing administrative proceedings. Id. at 628-29. The Court found that its past "concern for comity and federalism is equally applicable to [*quasi*-judicial] pending state proceedings." Id. at 627.

Here, the administrative Notice of Intent suffices. Therefore, the entire complaint should be dismissed — not just the request insofar as it relates to criminal prosecution.

5. The Policies Animating Younger Also Require This Court To Dismiss This Complaint.

While black-letter law dictates dismissal, it is satisfying to note that such dismissal will further the underlying policies of the Younger case. This conclusion has underpinnings in the logic of the Younger precedent itself.

a. As background, Younger rests on profound principles of equity, comity, and federalism.

The Court's specific ruling in Younger v Harris, 401 U.S. 37 (1971), that it is improper for a federal court to enjoin an ongoing state court criminal prosecution, is not the only import of the opinion. The theoretical underpinnings are highly instructive. In Younger, Justice Black wrote that, as between the federal and state courts, the traditional equitable reluctance to interfere with criminal prosecutions was reinforced by an even more vital consideration:

> [T]he notion of 'comity', that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as 'Our Federalism,' and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of 'Our Federalism.' . . . [T]he concept . . . represent[s] . . . a system in which there is sensitivity to the legitimate interests of both State and National Government, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with . . . the States. It should never be forgotten that this slogan, 'Our Federalism,' born in the early struggling days of our Union of States, occupies a highly important place in our Nation's history and its future.

Id. at 44-45.

Thus, the overall background of Younger is, of course, the system of "dual sovereignty" established by the Constitution, a concept that the Court has perennially reinforced in the years since Younger. See, e.g., Gregory v. Ashcroft, 501 U.S. 452, 457 (1991); Printz v. United States, 521 U.S. 898, 918-20 (1997). Although the states surrendered many powers to the new federal government, they retained "residuary and inviolable sovereignty." THE FEDERALIST NO. 39, at 245 (J. Madison). As this Court has stated, such principle undergirds "the fundamental principle of comity between federal courts and state government . . .." Tomaiolo v. Transam. Corp., 131 F. Supp. 2d 280, 289 (D.R.I. 2001), aff'd, 281 F.3d 1 (1st Cir. 2002).

6. Younger necessarily applies to pre-indictment situations.

It follows that Younger's concerns are broadly applicable. Although, classically, Younger applies to formally pending state prosecutions, the scope of the judicial application is not so limited as is reflected in the case-law cited above. In other words, the rule is *not* limited to cases such as Younger itself, in which the lower court had enjoined the district attorney from further prosecution of a then-pending action against the plaintiff. By its reasoning, the rule also applies whenever the orderly course of state prosecutions would be seriously hindered by piecemeal federal determination of issues that arise during the course of state proceedings.

The relief that Younger denied is functionally equivalent to the request being made by the Plaintiff here. Based solely on plaintiff's actions in Rhode Island (including, possibly, acts other than a mere violation of the out-of-state waste ban), Plaintiff could be the subject of a Rhode Island investigation (which may include the fruits of the judicially-authorized warrant). Plaintiff now asks this Honorable Court to prevent any such investigation. Thus, Plaintiff seeks to immunize itself from the possible *discovery* of its misdeeds (even the misdeeds of others). Thus, the underlying of comity and federalism strongly militate against the complaint's

injudicious attempt to have this Court interfere with the judicial and pre-judicial processes of a sovereign state.

7. Younger itself articulates concerns that apply to pre-prosecution investigative and search activities.

Younger itself contains the seeds of this expansion. *First*, is the explicit insistence of the Court that it was leaving open the possibility that federal courts might abstain if there were no pending state prosecution at the time the federal action began. *Second*, the principal precedent on which the Court relied, Fenner v. Boykin, 271 U.S. 240 (1926), dealt, as Younger itself recognized, with "state criminal proceedings not yet formally instituted" and the Court went on to cite five other cases "involving [mere] threatened prosecutions." Id. at 45.

8. Other cases articulate concerns that apply to pre-prosecution investigative and search activities.

This is reinforced in the cases cited previously in this memorandum and in other cases as well.

*a. The Boyle case*

In a companion case to Younger, Boyle v. Landry, 401 U.S. 77 (1971), the plaintiffs sought to halt, in advance, the enforcement of a number of Illinois criminal statutes. The Supreme Court appears to have applied, to a factual context where charges had not yet been brought, the rigorous Younger v. Harris test. Id. at 81.

*b. The O'Shea case*

In O'Shea v. Littleton, 414 U.S. 488 (1974), the suit challenged the state court system for setting bond, sentencing, and imposing jury fees. The Court held that federal court intervention "would indirectly accomplish the kind of interference that Younger v. Harris, and related cases, sought to prevent." Id. at 500. The Court continued:

> [T]he Court of Appeals misconceived the underlying basis for withholding federal equitable relief . . .. The objection [to such

> relief] is to unwarranted **anticipatory** interference in the state criminal process by means of continuous or piecemeal interruptions of the state proceedings by litigation in the federal courts . . ..

Id. at 500 (emphasis added). The Court further stated:

> An injunction . . . would disrupt the normal course of proceedings in the state courts via resort to the federal suit for determination of the claim ***ab initio***, just as would the request for injunctive relief . . . which was found to be unwarranted in Younger.

Id. at 501 (emphasis added). Accord, e.g., Wallace v. Kern (III), 520 F.2d 400, 406 (2nd Cir. 1975) (enjoining the state's denial of bail "would indirectly accomplish the kind of interference that Younger . . . sought to prevent.").

*c. The Rizzo case*

In Younger itself, the Court had spoken in terms of the relation between federal and state *courts*. But the doctrine's philosophy has not been so limited. In the leading case of Rizzo v. Goode, 423 U.S. 362 (1976), the Court held that the concept must also be taken into account when relief is sought against those in charge of the law enforcement functions of the *executive* branch of state or local government (such as agency heads with investigative powers):

> Thus the principles of federalism which play such an important part in governing the relationship between federal courts and state governments, though initially expounded and perhaps entitled to their greatest weight in cases where it was sought to enjoin a criminal prosecution in progress, have not been limited either to that situation or indeed to a criminal proceeding itself. We think these principles likewise have applicability where injunctive relief is sought **not against the judicial branch** of the state government, **but against those in charge of an executive branch** of an agency of state or local governments . . ..

Id. at 561 (emphasis added).

*d. The Morales case*

In addition, the Supreme Court has expressly stated (albeit in *dictum*) that the Younger doctrine applies to "about-to-be-pending" state criminal proceedings. Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381 n.1.

* * *

In sum, the courts' extension of the Younger rule to the preliminary pre-indictment stages of prosecutions is consistent with the rationale of that decision; — the overall effect of these authorities has limited access to the federal courthouse with respect to most challenges to state pre-prosecutorial activities.

IV. THE ANTI-INJUNCTION ACT IS A BAR.

The Anti-Injunction Act, 28 U.S.C. § 2283, further complicates the plaintiff's attempt to justify an injunction. That statute provides: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." A federal court may not enjoin a state proceeding unless the injunction falls within one of the three exceptions (none of which apply here; it is to be specifically noted that the State was not a party to the consent decree). While the statute does not apply to § 1983 action, here the complaint's express terms demonstrate that the plaintiff does not rely on that Civil Rights Act.

It must be noted that, while the Act only applies to pending proceedings, this requirement is met here in light of the existence of the search warrant. This argument is directly and logically linked to the argument made in Heading I (with respect to the applicability of Younger).

## V. IF APPLICATION OF YOUNGER OR THE ANTI-INJUNCTION ACT IS PREMATURE, THEN THE COMPLAINT DEFINITELY FAILS AS A PART OF A CLAIM BROUGHT WITHOUT STANDING.

In the unlikely event that the Plaintiff escapes abstention (on the grounds that no formal charges have been filed), then the Plaintiff almost certainly lacks standing since any possibility of charges is merely speculative. One need look no further than Younger v. Harris, *supra*, itself to find the source of plaintiff's dilemma. In addition to its famous announcement of the abstention rule, Younger also included a lesser-known holding refusing jurisdiction to yet-uncharged putative state defendants seeking federal relief.

In Younger, four plaintiffs (one of whom was Harris, whose name appears in the citation to the case) had obtained an injunction in the lower court against prosecutions. The Court found that three of the four plaintiffs lacked standing, as they did not have an actual, live controversy with the state prosecutors. Id. at 42. Only Plaintiff Harris was actually being prosecuted, and only in his case did the Court venture towards the actual merits.

For the reasons set forth herein, the Defendant respectfully requests that this motion be granted and the complaint filed by RIRRC be dismissed with prejudice.

Respectfully submitted
Rhode Island Department of
Environmental Management
By its attorney

John A. Langlois, Esq. RI Bar No. 3488
Deputy Chief Legal Counsel
DEM – Office of Legal Services
235 Promenade Street
Providence, RI 02908
(401) 222-6607
(401) 222-3378 (Fax)

Respectfully submitted
State of Rhode Island
By its attorney
Patrick C. Lynch
Attorney General

Michael Rubin, RI Bar No. 3656
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Extension 2116
(401) 222-3016 (Fax)

**CERTIFICATION**

I, the undersigned, hereby certify that a copy of the foregoing was sent regular mail, postage pre-paid to those listed below, on this 5th day of May, 2006.

Patricia K. Rocha, Esq.
R. Bart Totten, Esq.
Kristen W. Sherman, Esq.
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

Richard A. Sherman, Esq.
Raymond M. Ripple, Esq.
EDWARDS & ANGELL, LLP
2800 Financial Plaza
Providence, RI 02903